KANSAS CITY SOUTHERN RAILWAY COMPANY v. WADE,
RECEIVER OF MISSOURI & NORTH ARKANSAS
RAILROAD COMPANY.

Opinion delivered February 11, 1918.

1. RAILROADS—DUTY TO PROVIDE STATIONS FOR PASSENGERS AND
FREIGHT—WAREHOUSES AND TRACKS.—It is the duty of a railroad
company to provide proper station house accommodations and
safeguard those who may go to the stations in order to become
passengers, or who may be passengers from incoming trains.
This duty also extends to receiving and discharging freight;
it also includes the providing of proper warehouses, switch
tracks, storage tracks and sufficient station grounds for these
purposes.

2. RAILROADS—COLLISION BETWEEN TRAINS OF TWO RAILROADS—RAIL-
WAY DEPOT COMPANY—NEGLIGENCE OF EMPLOYEES OF LATTER COM-
PANY.—Four railroads entering a certain city, organized a "Union
Depot Company," to care for and control the depot business and
facilities of the four companies within certain defined limits, the
companies entering into a contract with the Depot Company fix-
ing the liabilities of the respective parties. A head-on collision
between a motor car of plaintiff and a train of defendant oc-
curred, resulting in the killing of over forty passengers on plain-
tiff's motor car, and the destruction of the said car. Plaintiff set-
tled all the death and injury claims and sued the defendant for
the amount of such payments, the value of the motor car, and
interest. Both railroads were using the same track. Defendant
contended that the Depot Company was responsible for the dam-
age, because of the failure of its telegraph operator to instruct
the conductor of the motor car to meet defendant's train at a
certain point, he having instructed defendant's train to wait at
the said point. Held, the Depot Company under its contract with
the railroad companies, was liable only for the acts of its serv-
ants in the performance of the duties required of it within the
yard limits, and in this case, held, the act of the telegraph opera-
tor in failing to deliver the order to plaintiff's train conductor,
not having anything to do with the duties required of the Depot
company, under its contract with the railroad companies, that
the defendant could not rely upon the contract of the four rail-
way companies with the Depot Company to escape liability.

3. RAILROADS—COLLISION—NEGLIGENCE OF JOINT EMPLOYEE—INJURY
TO PASSENGERS—DESTRUCTION OF PROPERTY—RAILROADS USING
SAME TRACK.—Under a contract between the parties, plaintiff
railway company used a portion of track belonging to defendant
railway company, the contract provided that train dispatchers,

telegraph operators and other employees of defendant company, having jurisdiction over the track mentioned, and employees about freight and passenger stations on said track, should be regarded as joint employees of both companies. The contract provided that in the event that any injury to persons or damage to property shall be caused by the negligence of a joint employee in the operations of trains over the track covered by the contract, that the loss shall be borne equally by both companies, and that each shall individually bear the damage to its own property. A collision occurred by reason of the failure of a telegraph operator employed by defendant, at a point on the line covered by the contract, to deliver an order from defendant's dispatcher to the conductor of a motor car belonging to plaintiff, instructing the conductor of the motor car to meet one of defendant's trains at a certain point on said line. In the collision plaintiff's motor car was demolished, and many passengers killed and injured. Plaintiff settled all these losses and sued the defendant for the full amount of its loss, and interest. *Held,* under the contract, that the telegraph operator was a joint employee of the two companies, that defendant company would be liable to plaintiff for one-half the personal injury losses, but would not be liable for the damage to the motor car.

4. RAILROADS—USE OF ONE TRACK BY TWO ROADS—COLLISION—CONTRACT FIXING LIABILITY.—The contract referred to in the two preceding head-notes, provided that plaintiff should not do any local business over the track in question unless so required by law, in which event it should assume without indemnity, full responsibility for all damage or losses to property or passengers so carried according to legal requirement. A supplemental contract should apply to local business done, whether required by law or not. *Held,* each clause in a contract must be read in the light of the others thereof, and that, defendant could not escape liability for damages sustained by local passengers, in view of the provision of the contract declaring equal liability, where the damage was the result of the negligence of a joint employee.

5. EVIDENCE—PERSONAL INJURY ACTION—RAILWAY COLLISION—STATEMENTS OF TRAIN CREW—CONTEMPORANEOUS STATEMENTS.—Plaintiff railway company was using a line of defendant railway companies' tracks; a collision occurred in which plaintiff's train was demolished and many passengers killed or injured. Plaintiff settled all claims, and brought an action against defendant for damages. It became an issue whether certain waiting orders were delivered to plaintiff's train crew; *held,* evidence was admissible, that when at a certain station, plaintiff's conductor received the orders, that he handed the same to his engineer, who read them, whereupon the conductor was heard to say to the

engineer that there was a clear road ahead to a point beyond which the collision occurred.

6. RAILROADS—COLLISION—NEGLIGENCE OF TELEGRAPH OPERATOR.— Where two railway trains, using the same track, collided head-on, the evidence *held* to warrant a finding by the jury that a certain telegraph operator was negligent in failing to deliver certain orders to one of the train crews.

7. REMOVAL OF CAUSES—REMOVAL TO FEDERAL COURT—REMAND TO STATE COURT—PRACTICE.—Where a cause was removed to the Federal Court, and was remanded to the State Court, the propriety of the remanding order will not be reviewed in the State Courts.

Appeal from Benton Circuit Court; *J. S. Maples,* Judge; modified and affirmed.

*James B. McDonough* and *Cyrus Crane,* for appellant; *S. W. Moore* and *F. H. Moore,* of counsel.

1. A verdict should have been directed for defendant because the operator, Hadley, was not the agent of the Kansas City Southern Railway Company but of the Joplin Union Depot Company, a separate and distinct entity. 186 Fed. 947; 203 *Id.* 953; 169 *Id.* 404; 162 *Id.* 556; 101 N. Y. S. 225. The operator was the sole agent of the depot company. 56 S. E. 624; 164 Fed. 785, 410; 14 How. 468; 177 Fed. 644; 114 *Id.* 100; 163 Pac. 209; 22 S. W. 570. See also 6 Mees. & W. 497; 176 Ill. 108; 98 Ill. App. 337; 28 Vt. 297; 133 Mo. App. 625; 100 *Id.* 617. The depot company was not the agent of the appellant, and Hadley was the agent of the depot company. 1 Ell. on Cont., § 549; 68 Fed. 105; 34 L. R. A. 625-7.

2. Plaintiff introduced no evidence to show the destination of the passengers injured and killed. Negligence must be proved and the burden was on plaintiff. Thompson on Negl., § 7695. See also 84 S. E. 334; 170 S. W. 591; 81 S. E. 335; 100 N. E. 942; 52 So. 406; Thompson on Negl., § 2237, and note; Elliott on Cont., § 579, 765-781, and others.

3. The conversations between Conductor Nicholas, Brakeman Bradley and Engineer Ratliff were inadmissible. They were no part of the *res gestae.* 3 Wigmore on Ev., § 1795; Chamberlain on Ev., § § 2579-2580-1. See

also 51 Ark. 509; 22 *Id.* 477; 50 *Id.* 397; 54 *Id.* 409; 58 *Id.* 52; 10 *Id.* 638; 126 *Id.* 332; 125 *Id.* 186, 217; 119 *Id.* 36; 114 *Id.* 56; 77 Ala. 374; 96 *Id.* 412; 152 Mass. 335; 14 W. Va. 277; 187 S. W. 433; 181 *Id.* 922; 176 *Id.* 896; 82 S. E. 662; 145 Pac. 743; 168 S. W. 369; 127 Pac. 166, etc.

4. The evidence establishes the fact that Conductor Nicholas signed for train order No. 84. The verdict is not supported by the evidence. 122 Ark. 445. A verdict can not be based on surmises, conjecture or suspicion. 141 N. W. 231; 42 D. C. App. 146; 106 N. E. 646; 174 S. W. 287; 174 *Id.* 547; 189 Ill. App. 316; 181 S. W. 938; 185 *Id.* 896; 235 Fed. 727; 183 S. W. 1099; 96 Atl. 967; 159 Pac. 927; 219 Fed. 686. Hearsay testimony is not satisfying. 10 Ark. 638; 122 *Id.* 445.

5. Under no circumstances is appellant liable for more than half of the damages under section 7 of article 3 of the contract.

6. The cause was properly removed to the United States District Court. High on Receivers (4 ed.), 60 a, b; 159 U. S. 36; 145 *Id.* 593; 3 Wall. 334; 109 U. S. 421; 139 *Id.* 628; 179 *Id.* 335; 173 *Id.* 113; 152 *Id.* 454; 161 *Id.* 588; 179 *Id.* 206.

7. The plaintiff, as receiver, was without authority to maintain this suit. 17 Howard 328; Simkins, Fed. Eq. St. 256; 136 U. S. 287; 99 *Id.* 235; 16 Wall. 203; 14 How. 52; 17 *Id.* 322; 149 U. S. 473; 136 *Id.* 223; 215 *Id.* 437; High on Receivers (last ed.), § 239.

8. The court erred in its instructions.

*J. V. Walker, O. L. Cravens* and *W. B. Smith,* for appellee.

1. Defendant owed plaintiff the duty to deliver train order No. 84; and in the discharge of that positive duty it selected Hadley, who, for the time and purpose, became defendant's agent. The trackage contract was not modified and defendant was guilty of negligence. Defendant had unlimited control over the jointly-used track. 128 Fed. 85, 91; 112 N. W. 875; 72 Fed. 455.

2.  Hadley was defendant's agent.   24 Ky. Law Rep. 2388; 74 S. W. 216; 66 Atl. 553.  He was performing their work.   105 Ark. 477; 111 *Id.* 497; 118 *Id.* 567; 137 N. Y. 248; 166 Mass. 268; 77 Ark. 551; 156 N. Y. 75; 123 N. W. 815; 112 *Id.* 875.

3.  Even if the Joplin Union Depot operating agreement is relevant, still under its terms the operator in delivering train orders would be the agent of defendant. The finding of the jury on the question of the agency of Hadley on the instructions is conclusive.   105 Ark. 477.

4.  If the collision was occasioned by the fault of the Kansas City company its liability was absolute and it is immaterial whether the destination of the passengers injured was to Neosho or beyond.   (1) Objection not properly made.   (2) Burden of pleading and proving exemption rested on defendant. 90 Ark. 182.   A complaint need not negative matters of defense.   76 Ark. 525; 98 *Id.* 214.

Under the trackage agreement the defendant was liable for the entire loss, if the collision was occasioned by its fault.   A contract should be construed as a whole and the various clauses given that construction that will make them consistent.   84 Ark. 435; 97 *Id.* 522; 104 *Id.* 475. The responsibility for the damages rested on defendant, the company at fault.   89 Fed. 560.

Contracts will not be construed to indemnify a person against his own negligence unless *such intention is expressed in unequivocal* terms.   74 S. W. 216; 77 S. E. 366; 84 *Id.* 468; 114 N. Y. S. 776; 66 Atl. 553; 172 Fed. 214; 194 Fed. 1011; 78 N. E. 1110; 29 *Id.* 151.   It was not material where the passengers were destined.   No word of a contract should be treated as surplusage or disregarded, if any meaning which is reasonable and consistent with the other parts can be given.   101 Ark. 22; 104 *Id.* 573. Under the contract defendant is liable for all injuries by its negligence.   76 S. E. 1087.

5.  Declarations made by Nicholas and Ratliff just before motor car started are admissible.   11 Enc. of Ev. 292-6-8-9, 306, 315, 333-4, 372-3, 385; 97 Mo. 165; 10 R. C. L. 974-980; 88 Mo. 631; 57 *Id.* 93; 132 *Id.* 301; 100 Ark.

269; 48 *Id.* 333, 338; 43 *Id.* 99, 103; 66 *Id.* 500; 85 *Id.* 479; 80 Ky. 399; 54 Atl. 289; 75 U. S. 397.

6. There was a conflict of evidence upon the question of delivery by Hadley of order No. 84, and the finding of the jury is conclusive. Opinion evidence and comparison of signatures was permissible. 50 Ark. 512; 108 *Id.* 392.

7. Defendant is liable for all the damages, not merely for one-half under the contract. 74 S. W. 216; 76 S. E. 1087.

8. The remand of the case to the State court is binding and conclusive. 59 Ark. 619; 83 *Id.* 599; 137 U. S. 451; 174 *Id.* 164; 175 *Id.* 635.

8. The jurisdiction of the receiver of the Missouri & North Arkansas Railroad Company was coextensive with the State, and he was authorized to prosecute this suit. Hopkins, Judicial Code, § § 56, 81; 151 Fed. 626; 75 Ark. 365; 11 C. J. 1235-6; 107 Fed. 1; 8 So. 84; 98 Ark. 370; 150 N. Y. 828; 98 Ind. 425; 119 Fed. 391, and many others.

9. There is no error in the instructions. 58 Ark. L. Rep. 194; 88 Ark. 210.

### STATEMENT OF FACTS.

On the 5th of August, 1914, there was a head-on collision between a motor car of the Missouri & North Arkansas Railroad Company carrying passengers and a regular passenger train of the Kansas City Southern Railway Company near Tipton Ford, in the State of Missouri. Forty-three passengers on the motor car were killed and several others were injured and the motor car was entirely demolished. The receivers of the Missouri & North Arkansas Railroad Company settled with the claimants for death losses and for personal injuries and instituted this action against the Kansas City Southern Railway Company to recover the amount so paid out by it and also for the value of its motor car. The grounds on which they sought recovery from the defendant were that the negligence of one of the defendant's employees caused the collision and that under a private contract between the

two railroad companies, the defendant was liable for the whole amount of the losses sustained.

The answer of the defendant contained a general denial of the allegations of the complaint, and averred that under the contract under which the two railroads were operating that it was only liable for a proportionate share of the losses.

The material facts are as follows: In 1907, the Missouri & North Arkansas Railroad was engaged in extending its line of road from Leslie, Arkansas, to Helena, Arkansas, on the south, and from Seligman, Missouri, to Joplin, Missouri, on the north. After it had extended its line from Seligman to Neosho, instead of building on to Joplin, it entered into an agreement with the Kansas City Southern Railway Company under the date of December 13, 1907, whereby it secured trackage arrangements over the line of road of that company between Neosho and Joplin and the joint use of the Kansas City Southern Railway Company's terminal at Neosho and Joplin. For convenience, the Missouri & North Arkansas Railroad Company will be hereinafter called the plaintiff and the Kansas City Southern Railway Company will be called the defendant.

The contract between the companies of the date of December 13, 1907, is divided into three articles.

Article 1 covers the grants and obligations of the defendant.

Article 2 contains the consideration to be paid by the plaintiff to the defendant for the trackage rights and expenses granted it.

Article 3 contains their mutual covenants and the covenants covering the mutual liabilities of the two companies.

Section 1 of article 3 provides that the plaintiff shall not do any local freight or passenger business on the line of the defendant's road between Neosho and Joplin and the intermediate towns unless required to do so by statute or some order of a railroad commission. The section also provides that in case the plaintiff is required to do

such local business it shall assume, without indemnity, full responsibility for all damage to or loss of property or death of or injury to persons carried, under such statute or order, the same as though that part of the road was owned and exclusively maintained and operated by the Arkansas company.

Section 7 of article 3 reads as follows: "Each party hereto shall for its own account assume all liability for any injury to person or damage to property that may be caused by it in the operation of its trains under this contract, whether resulting from collision or otherwise, over the road hereinbefore mentioned, and the other party shall not be liable to contribute any sum whatsoever on such account, and should such payment or contribution be made by the party not at fault, by process of law, or otherwise, the party at fault shall protect the other party against such liability and indemnify said party from the cost and expense that may have been incurred therein.

In the event that any injury to person or damage to property shall be caused by the joint negligence of both parties, or by the negligence of a joint employee in the operation of their trains over the track covered by this contract (including train employees engaged in operating any train employed in betterment or maintenance of joint track), whether accruing to the parties hereto or to third persons, shall be borne equally by the parties hereto; provided, that in the event of a collision caused by the negligence of both parties hereto or of a joint employee, each party shall at its own expense pick up and remove its own wreckage, and each party shall assume for itself the damage done its property and the property in its charge or control; if the Arkansas company shall fail to promptly pick up and remove such wreckage so to be removed by it, the Kansas City company may pick up and remove it and the cost thereof, plus 10 per cent. (10%), shall be borne by the Arkansas company. Where the loss or damage shall accrue to the property of the parties hereto, or either of them, or to third parties, and it can not be ascertained which party caused such loss or damage, the

expense thereof shall be treated as a maintenance charge and shall be paid in the manner and in the proportion heretofore set forth.    Where suit is brought against one of the parties hereto upon a claim or, cause of action for which the other party is responsible, the party sued shall notify the other party and turn over the defense of the case, if desired, to such other party, but both parties shall co-operate in the defense of all suits and furnish information therefor each to the other.    The rules governing the operation of trains over said track that may be in effect from time to time, shall be considered as the rules of each company party thereto.    Train dispatchers, telegraph operators and other employees of the Kansas City company having jurisdiction over the track hereinbefore mentioned, so far as their work is connected with the operation of trains over such track, and employees at the passenger and freight stations at Neosho, such as ticket sellers, freight agents, telegraph operators, warehouse men, baggage handlers, clerks, laborers and all other persons employed in and about the operation of said passenger and freight station, shall be considered as the joint employees of both companies and not as the sole employees of either company.''

A supplemental agreement to this was executed on the first day of April, 1910.    Under it the plaintiff was allowed to carry passengers between Neosho and Joplin and from Joplin to Neosho.    It was also provided in that agreement that section 1 of article 3 above referred to should apply to said local business with like force and effect as if said local passenger business was done by requirement of local statute or order of a railroad commission.    The Atchison, Topeka & Santa Fe Railroad Company and the Missouri, Kansas & Texas Railway Company also entered the city of Joplin.    These railroad companies, together with the plaintiff and defendant, entered into an operating agreement with the Joplin Union Depot Company on May 2, 1910.    The depot company was legally organized under the statutes of Missouri for the purpose of acquiring sufficient yards and terminal facili-

ties in the city of Joplin with which to discharge the duties imposed by law upon all the four railroads above named which enter the city of Joplin. The operating agreement between the depot company and the four railway companies was divided into four articles.

Article 1 contains the grants of the depot company. Under section 1 of article 1 the depot company agreed to acquire necessary land and complete the construction of an union passenger depot and union freight depot and all the sidetracks and other tracks and structures appurtenant thereto. It contained the following:

"The said Union Passenger Depot and Union Freight Depot, and the tracks and other facilities of the depot company, and all additions, betterments, extensions and improvements thereto, and all the facilities appurtenant thereto that are now owned or may be hereafter acquired by the depot company are hereinafter referred to as 'depot facilities.'"

Under section 2 the railway companies are granted for a certain period the right of running their passenger trains into the union depot and over and upon the railroads and road tracks of the depot company. Under section 3 the depot company agreed to keep and maintain a roundhouse, turntable, storage tracks, cleaning tracks and other similar facilities where it would care for and make light repairs on the freight and passenger engines of the railway company.

Under section 4 the right was granted each of the railway companies of running its freight trains drawn by its own motor power and manned by its own crews over said depot facilities or any part thereof.

Under section 5 the depot company agreed for all internal improvements therefor to furnish motive power, switch, move and handle freight cars of the railway companies over the depot facilities.

Under section 6 the depot company agreed to keep and maintain said depot facilities at all times in good repair.

Article 11 covers the payments to be made by the railway companies to the depot company for the services performed for them by the latter.

Section 6 requires the railway companies to pay monthly *pro rata* on a wheelage basis, all the expenses of the operation, maintenance, renewal and repair of the depot facilities, including all salaries, cost of labor, etc. This section also in detail provides the method of determining the contributions by each company.

Article 3 contains the mutual covenants for the operation of the depot facilities.

Section 1 provides that the depot company shall have the exclusive management and control of the operation, maintenance and repair of the depot facilities and shall establish rules and regulations governing the operations of trains over the depot facilities.

Section 2 provides for the removal of any employee of the depot company who shall be deemed incompetent by any of the companies.

Section 6 provides that the payment to be made by the railway companies under section 6, article 2, shall cover only the use and enjoyment of the depot facilities and such services as are for the common benefit of the railway companies.

Section 7 provides that the depot company "shall be liable for all losses and damages suffered or incurred by the railway companies, or by any other corporation or person, through or by reason of any negligence, carelessness, misconduct or other fault of the depot company, or of any of its officers, agents, employees or servants in the management, operation, maintenance, repair, betterment, extension and renewal of the depot facilities; and all sums paid by the depot company under this clause shall be included as part of the maintenance and operating expenses as provided for in section 6, article 2, and shall be paid accordingly."

The facts immediately preceding the collision are substantially as follows: On the 5th of August, 1914, a freight train of the defendant was derailed on its line

south of Neosho and this resulted in a congestion of trains on each side of the wreck. A passenger train going north was made up on the north side of the wreck and was directed by the train dispatcher at Pittsburg, Kansas, who had jurisdiction over the operation of that part of the defendant's line, to proceed as the first section of No. 56, a fast freight train. The train dispatcher at Pittsburg ordered this train to meet a south-bound motor car of the plaintiff carrying the passengers, at Tipton Ford, a point between Joplin and Neosho. The distance between Joplin and Neosho was 19.70 miles and the distance between Joplin and Tipton Ford was 10.70 miles. The order for the two trains to meet at Tipton Ford was sent by the train dispatcher to the operator at Joplin to be by him delivered to the conductor of the motor car of the plaintiff, going south. A copy of his order was also sent from the dispatcher's office to the telegraph operator at Neosho to be delivered to the conductor of the defendant's train going north. The motor car of the plaintiff did not stop at Tipton Ford to await the arrival of the north-bound passenger train of the defendant. The motor car passed the station of Tipton Ford at the rate of about thirty-five miles an hour. The passenger train of the defendant was running at the rate of probably thirty miles an hour. By reason of a curve in the track the operators of the two trains could not see each other until they were very close together. On account of the great force with which the trains ran together the engine of the passenger train plowed through the motor car killing forty-three passengers on it and injured several others. The motor car was entirely demolished. The plaintiff settled the claims for injuries and death losses for the sum of $154,681.72. Its motor car was destroyed and its value amounted to $15,666.22. The plaintiff demanded the payment of these amounts together with the accrued interest, making a total of $189,996.59. This demand was made on December 26, 1916. The claim of the plaintiff against the defendant for this amount was based on the ground that the collision occurred through the negli-

gence of Hadley, a telegraph operator at Joplin. It is alleged that he was the agent of the defendant and failed to deliver the message to the conductor of the motor car of the plaintiff directing him to hold his train at Tipton Ford for the arrival of the northbound passenger train of the defendant. The defendant refused to pay the amount demanded on the ground that the collision did not occur on account of the negligence of Hadley. It also set up as an additional ground that in no event would it be liable for more than one-half of the amount of losses for death and injury to the passengers on the motor car and for nothing on account of the destruction of the motor car. This claim was made on the ground that under the operating agreement between the two companies Hadley was the joint agent of both companies and that losses like the one under consideration were to be shared equally by the two companies. After the collision occurred an agreement was entered into by the parties whereby the plaintiff might settle the claims of third parties and that this settlement should not in any manner interfere with the rights of the parties to this suit under their private contract for the operation of trains of the plaintiff over the tracks of the defendant between Neosho and Joplin. It was also shown that the message directing the two trains to meet at Tipton Ford was sent out from the train dispatcher's office at Pittsburg, Kansas, to the telegraph operators at Joplin and Neosho. The message was delivered by the telegraph operator at Neosho to the conductor of the north bound passenger train of the defendant.

Hadley testified in positive terms that he delivered the message to Nicholas, the conductor of the south bound motor car of the plaintiff. There was also exhibited to the jury the record copy in his office which he testified that Nicholas signed, showing that he had received the message in question. Several handwriting experts who had compared this signature with an admittedly genuine

signature of Nicholas, testified that Nicholas had signed the train record in question.

On the other hand several experts who had made a like comparison testified that it was not the genuine signature of Nicholas. It was also shown that Nicholas was suffering with heat on the day of the collision. Other evidence was introduced on the part of the defendant tending to show that Hadley delivered the message in question to Nicholas.

On the part of the plaintiff it was shown that Nicholas had been a conductor on this part of the road for several years and was thoroughly familiar with it; that he was an old employee of the plaintiff and had always been very careful and painstaking in the discharge of his duties.

Another employee of the plaintiff testified that he saw him after the motor car passed the station at Tipton Ford and that Nicholas waved him a friendly greeting. Several witnesses testified that they saw Nicholas deliver to the engineer of the motor car train orders at Joplin and the engineer read the orders delivered to him in the presence of Nicholas; that after the engineer had read the orders that Nicholas remarked to him that they had a clear track to Neosho and that the engineer seemed to acquiesce in the statement.

The court directed the jury if it found for the plaintiff to find for it in the sum of $189,996.59 with interest thereon at the rate of six per cent. per annum from December 26, 1916. The jury returned a verdict for the plaintiff. From the judgment rendered the defendant has duly prosecuted an appeal to this court.

HART, J., (after stating the facts). (1-2) It is contended by counsel that a verdict should have been directed in favor of the defendant. This contention is based on the claim that Hadley, whose alleged negligence is relied on for a recovery by the plaintiff, was not the agent of the defendant company but of the Joplin Union Depot Company. Counsel rely upon the agreement of May, 2, 1910,

between the Joplin Union Depot Company and the four railroad companies entering the city of Joplin. It is conceded that the depot company was legally organized under the laws of the State of Missouri, and that the contract between it and the railroad companies was a valid one. It is the duty of the railroad companies to provide proper station house accommodations and safeguard those who may go to stations in order to become passengers or who may be passengers from incoming trains. This duty also extends to receiving and discharging freight. It also includes the providing of proper warehouses, switch tracks, storage tracks, and sufficient station grounds for these purposes. Four different railway companies, including the parties in this action, entered the city of Joplin. For convenience and economy, the persons interested in the four different railroads organized the Joplin Union Depot Company for the purpose of discharging their stational duties to the public. In the discharge of that duty the depot company acquired the necessary yards at Joplin for station facilities and erected thereon its own station buildings, tracks and other structures. The contract between it and the railway companies established certain private relations between them which must be considered in any controversy among themselves. By the terms of the contract the depot company employed all the servants who were used in and about the yards of the company at Joplin. This included telegraph operators and also discharged the additional duty of assisting the train dispatchers of the various roads in the operation of trains. These servants are all employed and paid by the depot company. The depot company was paid for its services by the railroad companies in proportion to the number of cars operated over the stational facilities by each company. Hadley, the telegraph operator whose negligence is claimed by the plaintiff to have caused the collision was employed by the depot company. The particular clause of the contract between the depot company and the railroad companies relied upon by counsel for the

defendant to establish the liability of the depot company for the negligence of Hadley in this case, is section 7 of article 3. It provides that the depot company "shall be liable for all losses and damages suffered or incurred by the railway companies, or by any other corporation or person, through or by reason of any negligence, carelessness, misconduct or other fault of the depot company, or of any of its officers, agents, employees or servants in the management, operation, maintenance, repair, betterment, extension and renewal of the depot facilities; and all sums paid by the depot company under this clause shall be included as part of the maintenance and operating expenses as provided for in section 6 of article 2 and shall be paid accordingly."

We do not think that this clause of the contract is susceptible of the construction placed upon it by counsel for the defendant. We have already stated the purposes for which the depot company was organized and the duties which it undertook to perform. By the express terms of the contract the "depot facilities" mean the yards and station grounds at Joplin, including the passenger and freight station buildings and other structures and all the tracks within the yard limits. The depot company had complete jurisdiction within the yard limits at Joplin and had complete authority over the servants engaged in carrying out its powers subject to the right of the railroad companies to ask it to discharge servants, for cause, in certain instances. Section 8 provides that each railway company shall pay the liabilities for loss or damage to property and injury or death to persons incurred by the depot company or by any of the railway companies using the depot facilities by reason of any negligence of any of the servants of such railway company. Section 6, article 2, of the contract requires the railway companies to pay on a wheelage basis, all the expenses of operation and maintenance of the depot facilities.

The contract also provides how the proportion of losses of the depot company shall be paid by each railway company. As we have already seen the depot com-

pany has the exclusive management and control of the operation, maintenance and repair of the depot facilities. This contract was entered into between the depot company on the one hand and the four railway companies entering the city of Joplin on the other hand. The depot company was organized exclusively for the purpose of serving these four railway companies within the yard limits in the city of Joplin. It is true its servants performed services in transmitting messages for the railway companies to points beyond its yard limits, but the corporation itself was organized for the purpose of serving the four railway companies within its yard limits at Joplin and its jurisdiction as a corporation did not extend beyond its yard limits. It is evident that all the railway companies were equally interested in the terms of the contract and the contract was entered into for the purpose of defining their mutual duties and obligations to each other.

When all these matters, as expressed in the contract itself, are considered and the particultr clause relied upon is read in the light of the other provisions of the contract, it is plain that it was only intended that the depot company should be liable for the acts of its servants in the performance of the duties required of it within the yard limits. The negligence of Hadley which is made the basis of a recovery by the plaintiff in this action, was in failing to deliver the train order to one of the conductors of the plaintiff company directing him to meet a passenger train of the defendant at Tipton Ford, a station about ten miles south of Joplin on the railroad of the defendant. His services in this respect did not have anything to do with the management, operation, maintenance, and repair of the depot facilities as expressed in the contract between the depot company and the four railway companies. Therefore the defendant can not rely upon the contract between the depot company and the four railway companies to escape liability in the present case.

(3)    The plaintiff and defendant had fixed their liabilities to each other in cases of this sort by the contract dated December 13, 1907, and the one supplemental thereto, dated April 1, 1910. They alone were parties to these contracts.    Section 7, article 3 of the contract of December 13, 1907, provides that in the event that any injury to persons or damage to property shall be caused by the negligence of a joint employee in the operation of trains over the track covered by the contract the loss shall be borne equally by the two railway companies. It provided further that in the event of a collision caused by the negligence of both parties or joint employee, each party shall at its own expense pick up and remove its own wreckage and each party shall assume for itself damage to its own property. Another clause of section 7, provides that each company shall be liable for any injury to persons or damage to property caused by the negligence of its own servants and that the party at fault shall protect the other party against liability incurred by it on account of such loss.    The latter part of the same section contains the following:

"Train dispatchers, telegraph operators and other employees of the Kansas City Company having jurisdiction over the track hereinbefore mentioned, so far as their work is connected with the operation of trains over such track, and employees at the passenger and freight stations at Neosho, such as ticket sellers, freight agents, telegraph operators, warehousemen, baggage handlers, clerks, laborers, and all other persons employed in and about the operation of said passenger and freight station shall be considered as the joint employees of both companies and not as the sole employees of either company."

It is the contention of counsel for the plaintiff that Hadley was the employee of the defendant and that his negligence caused the collision.    Therefore they contend that the defendant is liable to them for the whole expense incurred by them in the settlement of claims for damages to third persons and for the damage to the plaintiff's own property.

On the other hand it is contended by the defendant that even if the collision was caused by the negligence of Hadley that he was a joint employee within the meaning of the contract and that it is only liable to the plaintiff for one-half of the damages paid out by it for personal injuries to third persons and is not liable at all for the damage done to plaintiff's property. In making this contention counsel rely upon the concluding part of section 7 which we have quoted above. It will be noted that this section provides in substance that train dispatchers, telegraph operators and other employees of the defendant having jurisdiction over the track hereinbefore mentioned, insofar as their work is connected with the operation of trains over such tracks, shall be considered as the joint employees of both companies and not as the sole employees of either company. The collision occurred between Joplin and Neosho, which was the portion of the track of the defendant covered by the contract in question. The correctness of the contention of the plaintiff in this respect depends upon whether or not Hadley was a telegraph operator within the meaning of those words in the clause of the contract just referred to. Pittsburg, Kansas, which was north of Joplin, was the end of a division of defendant's line of road. Trains south of that point were operated under the direction of the train dispatcher at Pittsburg. He would send or cause messages to be sent out to Joplin, Neosho and other stations on the line of defendant's road within his jurisdiction. He sent a message to Hadley at Joplin, to be delivered to the conductor of plaintiff's motor car going south, to meet at Tipton Ford, number 209, a passenger train on defendant's line of road going north. This same message was sent by the train dispatcher from his office at Pittsburg to the operator at Neosho to be given to the conductor of the passenger train going north which was to meet the plaintiff's train going south at Tipton Ford.

It is earnestly insisted by counsel for the plaintiff that Hadley, the operator at Joplin, was not a telegraph

operator within the meaning of the clause just referred to. We do not agree with counsel in this contention. We think that the words, ''telegraph operator'' as used, refer to all telegraph operators who assist the train dispatcher in the operation of trains over the track over which he has jurisdiction. Such telegraph operators execute the orders delivered to them by the train dispatchers in connection with the operation of the trains and we think are joint employees of both companies within the meaning of the contract just as much as are train dispatchers whom they assist in the operation of trains. The word ''jurisdiction'' in Webster's New International Dictionary has three meanings. In law it means the legal power to hear and determine a cause. Second: It refers to the authority of a sovereign power to govern or legislate. Third: It is defined as the limits within which any particular power may be exercised. The last is the meaning which the word necessarily has in the clause of the contract referred to. It means the limits of the road within which the train dispatcher directs the operation of the trains. For instance, the train dispatcher directs the movement of trains over a particular portion of the road. He has jurisdiction over this particular portion of the road, directing the movement and operation of trains. The telegraph operators who receive and transmit his orders, exercise authority within the same limits so far as their work is connected with the operation of trains over the tracks. Therefore we think Hadley was a joint employee within the meaning of this clause of the contract with reference to the delivery of the message in question to Nicholas, the conductor on plaintiff's line of railroad. It follows that even if Hadley was negligent in the respects charged, the defendant would not be liable for the whole amount sued for by the plaintiff. It would not be liable at all for the loss or damage to the property of the plaintiff. It would only be liable to the plaintiff for one-half of the amount paid out by it in the settlement of claims for death and personal injuries received by third persons in the collision.

(4). Section 1, article 3, of the contract of December 13, 1907, provides that the plaintiff shall not do any local freight or passenger business between Neosho and Joplin unless required to do so by some statute or order of a railroad commission. In the event the plaintiff should be required to do such local business, it was provided that it should assume without indemnity, full responsibility for all damage to or loss of property or death of or injury to persons carried, unless under statutes or orders of a railroad commission. By a supplemental agreement of April 1, 1910, it was provided that section 1 of article 3 of the former contract should apply to local business as fully and with like force and effect as if such local passenger business was done by requirement of a legal statute or order of a railroad commission. The record does not show whether or not any of the passengers killed or injured in the collision were local passengers between Joplin and Neosho within the meaning of the clause of the contract just referred to.' Therefore, they contend that the judgment should be reversed for this reason because under the clause referred to the plaintiff would be absolutely liable for injuries to such local passengers if any were on board at the time the collision occurred. We do not agree with counsel in this contention. It is a cardinal rule of construction of contracts that each clause must be read in the light of the other portions of the contract. It will be noted that the contract between the parties as to local passengers between Joplin and Neosho was that in the event the plaintiff was required to carry such passengers it should assume, without indemnity, full responsibility for damages on account of carrying such persons the same as though the road was owned and exclusively maintained and operated by it. This refers to damages caused by the defective condition of the track or on account of the negligence of its own servants in operating its trains. It was doubtless recognized that the defendant in reality as owner of the track would be liable as far as third persons are concerned for all damages to persons or property sus-

tained by the operation of trains over its track. It could not escape such liability by giving another company trackage facilities over its road. So we think when this clause of the contract is considered in the light of the other clauses of it, it was intended that the plaintiff in the respects just named, should be liable for damages caused by the condition of the track or by the negligence of its own servants in the operation of trains over it, and should indemnify the defendant for any losses it might suffer thereby. As we have already seen, there was another clause which provided that the liability should be borne equally by the parties when the damage was caused by the negligence of the joint employees. When this construction is placed upon the contract all the clauses in it are harmonized and there is no contradiction between them.

(5) It will be noted from the statement of facts that certain witnesses testified that they saw the conductor, Nicholas, at Joplin hand the engineer of the motor car some orders which he had received at the station there. The witnesses were allowed to state that they saw Nicholas hand some orders to the engineer and saw the engineer read them; that after the engineer finished reading the orders they heard the conductor say to the engineer, there was a clear board or clear track to Neosho.

It is earnestly insisted by counsel for the defendant that the court erred in submitting to the jury the declaration of the conductor to the effect that they had a clear board or track, from Joplin to Neosho. We do not agree with counsel in this contention. It is conceded that it is competent to prove by the witnesses that Nicholas delivered some orders to the engineer and that the engineer read them. These were acts of the parties in the discharge of their duties. It was the duty of the conductor to receive the train orders and to deliver them to the engineer. The engineer read the orders delivered to him by the conductor. The train was about to leave the station and these orders were the guide of the conductor and the engineer in running the train. It was

highly essential that each of them should understand
the orders. The declaration of the conductor to the effect
that they had a clear board to Neosho and the assent of
the engineer thereto was calculated to explain their acts
and to show that they both understood that they were
not to stop at any intermediate point to await the ar-
rival of the north bound train. All that occurred be-
tween the parties at the time the conductor delivered
the orders to the engineer was so connected as to con-
stitute one transaction and for that reason distinguished
the declaration from mere hearsay. The declaration
illustrated the character of the principal transaction,
was contemporaneous with it, and derived some degree of
credit from it. The main transaction may extend over a
longer or shorter period of time according to its nature.
Jones on Evidence (2 ed.), secs. 356 and 358, and *Lund*
v. *Inhabitants of Tyngsborough,* 9 Cush. (Mass). 36.

(6) It is next insisted that there is no testimony
tending to show that there was any negligence on the
part of Hadley in failing to deliver the train order in
question but in this contention we can not agree with
counsel. It is true Hadley testified in positive terms that
he did deliver the order to Nicholas and exhibited a train
sheet or record, purporting to have been signed by Nicho-
las acknowledging the receipt of it. Expert witnesses
were introduced who after comparing the signature with
admittedly genuine signatures of Nicholas, testified that
Nicholas had signed the train sheet or record. There
were also other facts and circumstances tending to cor-
roborate the statement of Hadley, but it can not be said
that this testimony is uncontradicted. Nicholas had been
long in the service of the plaintiff and was perfectly fa-
miliar with his duties. He had run over this part of
the line of road many times and was thoroughly famil-
iar with it. It was shown that he stated to the engi-
neer after delivering some orders, and they had been
read by the engineer, that he had a clear track from Joplin
to Neosho. The engineer acquiesced in his statement and
the train pulled out. The motor car was not stopped by

Nicholas at Tipton Ford as directed by the order in question. Just after the car passed the station Nicholas waved a friendly greeting to another employee of the company whom he passed. Experts testify that the signature to the train sheet or record referred to above was not the genuine signature of Nicholas. The collision occurred just beyond the station of Tipton Ford and under all the facts and circumstances the jury was justified in inferring that Nicholas did not receive the order or he would have stopped his train at Tipton Ford in compliance with it.

(7)   This action was brought by the plaintiff, a corporation, organized under the laws of the State of Missouri, against the defendant, a corporation also organized under the laws of the State of Missouri, in the Benton circuit court, in Benton County, Arkansas.

The defendant filed a petition to remove the cause to the United States District Court for the Ft. Smith Division of the Western District of Arkansas, alleging a Federal question, and the order of removal was granted. The plaintiff filed in the Federal Court a petition to remand the case. This petition was granted and an order was made remanding the case to the State court.

Section 28 of the United States Judicial Code is as follows: "Whenever any cause shall be removed from any State court into the District Court of the United States, and the District Court shall decide that the cause was improperly removed, and order the same to be remanded to the State court from whence it came, such remand shall be immediately carried into execution and no appeal or writ of error from the decision of the district court so remanding such cause shall be allowed."

In the construction of this provision in *St. L., I. M. & S. R. Co.* v. *Neal*, 83 Ark. 591, the court held that where a cause was removed from a State court, and was remanded by the latter court to the former court, the propriety of the remanding order will not be reviewed in the State court. This view of the statute is in accord with the decisions of the Supreme Court of the United

States, some of which are cited in the opinion in that case and need not be repeated here.

The only disputed issue of fact in the present case was in regard to the alleged negligence of Hadley in failing to deliver the telegram in question to Nicholas, the conductor of the motor car which collided with the passenger car of the defendant at Tipton Ford and formed the basis of this lawsuit. That question has been submitted to the jury under proper instructions upon competent evidence and the finding of the jury is against the contention of the defendant. There was evidence of a substantial character to support the verdict of the jury in this respect and it follows that the liability of the defendant to the plaintiff has been established.

Under the views we have expressed in this opinion, the defendant was not liable to the plaintiff for the value of the property of the plaintiff destroyed in the collision. It was only liable to the plaintiff for one-half of the amount of the damages paid by the plaintiff to third persons in settlement of personal injuries and death losses caused by the collision.

To correct the error of the court in these respects the judgment will be reversed and judgment will be entered here for the sum of $87,165.18, being one-half of $154,681.72, the amount expended in settling personal injury claims, and interest on same at six per cent. from the date of payment until December 26, 1916, the date of demand, and that this amount, $87,165.18, bear interest at six per cent. from April 13, 1917, the date of the judgment in the circuit court.

It is so ordered.